**INKS, Appellee, v. JONES & LAUGHLIN STEEL CORPORATION and CUYAHOGA VALLEY RAILWAY COMPANY, Appellant.**

Ohio Appeals, Eighth District, Cuyahoga County.

Nos. 24674, 24675. Decided June 25, 1959.

Endress & Endress, for appellee.

Bulkley, Butler, Rini & Schweid, for appellant, The Cuyahoga Valley Railway Company.

Squire, Sanders & Dempsey, for appellant, The Jones & Laughlin Steel Corporation.

(Judges of the Ninth District sitting by designation in the Eighth District.)

## OPINION

By STEVENS, J.

The two appeals on questions of law numbered above grow out of separate appeals prosecuted by the two defendants from a single joint and several judgment against both.

The appeals were submitted and heard together.

Gerald Inks was employed as a truck driver by Powers Trucking Company, and at 12:55 a. m., on August 31, 1955, drove his employer's tractor and trailer, loaded with more than 16 tons of coke breeze, to the Clark Avenue gate of Jones & Laughlin's Cleveland works. He stopped at the gate, reported the material he was bringing in to the guard, and told the guard, whom he knew from previous trips into the plant, that he knew where to take his load.

He then proceeded upon the premises of the Steel Corporation, through an underpass and up an incline, toward a point where an intraplant railroad crossed at grade the road upon which he was driving. He knew of the railroad track and its location from previous trips which he had made into the plant grounds.

When the tractor had reached a point two or three feet from the first rail of the railroad track, as he approached it, Inks testified that he stopped, looked to the right and to the left, saw nothing, proceeded on across said track for about eight feet, when he was struck from the right by a Diesel engine owned by defendant Cuyahoga Valley Railway Company, and being used upon what was termed the "ingot job," to transport molds containing hot metal from the Jones & Laughlin Corporation open hearth furnace to the Blooming Mill, and returning the empty cars to the open hearth furnace. The railroad track was straight for a substantial distance to the right and left of the crossing in question.

In that collision, Inks was thrown from his tractor onto the ground, and sustained certain personal injuries, for which he instituted action against the defendants, seeking recovery therefor.

Trial to a jury resulted in the return of a verdict for $17,500 against both defendants, upon which judgment was subsequently entered.

Motions for directed verdicts were made at appropriate times, and overruled as to both defendants, as were motions for judgment notwithstanding the verdict and for a new trial. These appeals on questions of law followed.

The assignments of error of the Cuyahoga Valley Railway Company are:

1. The trial court erred in overruling the motions of this defendant

in the alternative: for judgment in its favor, or a directed verdict at the conclusion of all the evidence.

2. Said court erred in overruling the motion of this defendant for judgment in its favor notwithstanding the verdict of the jury returned in favor of plaintiff.

3. Said court erred in refusing to give to the jury before argument this defendant's written requested instruction on the "loaned servant" doctrine.

4. Said court erred in refusing to give to the jury before argument this defendant's written requested instruction on contributory negligence.

The assignments of error of the defendant The Jones & Laughlin Steel Corporation follow:

1. The trial court erred in overruling the motion of this defendant tor judgment in its favor or for a directed verdict made at the end of all the evidence.

2. The trial court erred in overruling the motion of this defendant for judgment in its favor notwithstanding the verdict of the jury or for a new trial.

3. The court erred in refusing to give to the jury before argument this defendant's written requested instruction "B" (on contributory negligence of plaintiff).

4. The court erred in its general charge to the jury to the prejudice of this defendant.

To the writer of this opinion it appears necessary, conceding the negligence of the defendants, to first explore the question of whether or not, as a matter of law, the plaintiff is shown by the evidence to have been guilty of negligence which proximately contributed to cause his injuries.

The bill of exceptions reveals the following testimony of the plaintiff, Inks, elicited on direct and cross-examination.

Pages 130 to 132, inclusive:

"Q. From that underpass along the roadway for a certain distance you would travel before coming to another object, is that correct?

"A. Yes, sir.

"Q. And what was the next thing that you came to?

"A. A railroad track.

"Q. Now, coming up * * * out of the underpass and approaching that railroad track, will you tell the jury approximately how fast you were operating that vehicle?

"A. Oh, between three and five miles an hour.

"Q. And as you approached that railroad track, what, if anything, did you do?

"A. I stopped.

"Q. And will you tell the jury where you stopped with reference to the first rail of the railroad track and the front end of your tractor?

"A. Two to three feet from the first railroad track.

"Q. And as you stopped at the railroad track, what next did you do?

"A. I looked to the right.

"Q. And when you looked to the right, state what, if anything, you observed?

"A. I saw nothing coming on the track.

"Q. And as you looked to the right, did you thereafter look another way?

"A. I looked to the left.

"Q. And when you looked to the left, what, if anything, did you observe?

"A. I saw nothing coming on the track even.

"Q. After making these two observations, tell the jury what next you did in connection with the operation of your truck.

"A. I began to let my clutch out and began to move into the blooming mill.

"Q. As you began to move, in what gear did you begin to proceed?

"A. First gear.

"* * *

"Q. Then, as you proceeded, did you start from that point two or three feet this side of the railroad tracks and proceed forward?

"A. Yes, sir.

"Q. Tell the jury approximately how far you proceeded before something next occurred?

"A. Eight feet.

"Q. And this eight feet, how do you measure that?

"A. Well, the front wheel was on the second rail.

"Q. Had crossed the first rail?

"A. Yes, sir.

"Q. And was to the second rail?

"A. Yes, sir.

"Q. And at that point will you tell the jury what, if anything, occurred.

"A. I was struck from the right."

Page 135:

"Q. At the time that you put your truck in motion to proceed across these tracks, I want you to state whether or not you had any indication of any kind whatsoever, that there was a locomotive being operated on the tracks at that time.

"A. I know it was a track, I know it was used, but I didn't know it was used that night.

"Q. Were there any warnings of any kind at that track that would indicate a train was being moved at that time?

"A. No sir."

Page 151:

"Q. * * * I will ask you to tell the jury the condition of the weather with respect to visibility on August 31, 1955, as you entered the plant.

"A. Well, it is smoggy and smoky down there just like any other steel mill and always (a) lot of conditions with that.

"Q. Sure, like any other mill.

"A. Hammer and loud explosions and a hissing sound.

"Q. After you entered, what is the fact as to whether or not there was smoke in the area?

"A. There was smoke in the air."

Page 155:

"Q. * * * So that you drove away from the American Steel & Wire and you found yourself ultimately down on Clark Avenue at the entrance to the Jones & Laughlin mill?

"A. Yes, sir.

"Q. You had been there many times before, hadn't you?

"A. Yes, sir.

"Q. 30, 40 times?

"A. Not this blooming mill. I have been in—

"Q. Well, I didn't say the blooming mill. You had been 30, 40 times into the Jones & Laughlin mill?

"A. Yes, sir.

"Q. Bringing in loads of material for your employer, Powers?

"A. Yes, sir.

"* * *

"Q. * * * And you told him" (the gate guard) "you knew where to go?

"A. Yes.

"Q. * * * So you then started ahead right towards that underpass; is that right?

"A. Yes, sir."

Page 164:

"Q. Now, you were conscious of the fact that there was a railroad track there, that is why you stopped?

"A. That is true.

"Q. You stopped because you thought there might be some risk that a train was coming?

"A. That's true.

"Q. You looked because you thought a train might be coming?

"A. Yes, sir."

The rule as to the duty of the driver of a motor vehicle about to pass over a railroad grade crossing on a public street has been recently stated by the Supreme Court of Ohio in Boles v. Baltimore & Ohio Rd. Co., 168 Oh St 551, as follows:

"The driver of a motor vehicle, about to pass over a railroad grade crossing on a public street, must exercise his senses of sight and hearing to discover whether trains are also about to pass over such crossing, and such exercise of the senses must be made at such time and place as to be effective for that purpose. (Detroit, Toledo & Ironton Rd. Co. v. Rohrs, 114 Oh St 493, and Patton v. Pennsylvania Rd. Co., 136 Oh St 159, approved and followed.)"

See also: Gigliotti v. N. Y., Chi. & St. Louis R. R. Co., 107 Oh Ap 174.

The case of Erie Rd. Co. v. Lade, 209 Fed. 2d 948, is authority for application of the rule above stated as to public highways, to private crossings of an intraplant railroad.

Application of the rule above set out to the evidence disclosed by this bill of exceptions compels the unanimous conclusion of the members of this court that the plaintiff, in exercising his senses of sight and hearing, did not see what could have been seen had he looked effectively, and not hear what should have been heard had he listened effectively.

480

Interrogatory No. 2:

"If Gerald Inks had looked as he approached the crossing on August 31, 1955, would he have seen the approaching train?"

Answer: "No."

Assuming that the interrogatory inquired whether, had he looked, as his outfit was stopped two or three feet from the first rail of the railroad at the crossing, would he have seen the approaching train, the negative answer of the jury could mean only that, because of the condition of smog, dust and cinders in the air prevailing at that time, and of the other conditions then and there pertaining, it was impossible for him to see the train approaching.

What, then, was his duty, to escape a conclusion of contributory negligence? That question is answered by the first paragraph of the syllabus in **Baltimore & Ohio Railroad Co. v. McClellan, Admx., 69 Oh St 142,** as follows:

"1. The rule that a person in full possession of his senses of sight and hearing should exercise them to protect himself from danger when about to cross a known track of a steam railroad at a street crossing, applies to a condition where the atmosphere is more or less clouded by steam and smoke, and it is negligence on his part which will defeat a recovery for injuries received from a passing train to undertake to cross without waiting for the atmosphere to clear so that his vision may be unobstructed, or taking other adequate means to ascertain the presence of danger."

This plaintiff, despite the presence of smog, dust, etc., and of the other conditions there existing, which prevented him from seeing the approach of the locomotive, according to the answer of the jury, without "taking other adequate means to ascertain the presence of danger," proceeded onto the crossing, and was almost immediately struck.

His failure to take "other adequate means to ascertain the presence of danger"—to wit, the approach of the locomotive, made him guilty of contributory negligence which proximately caused his injuries, and that as a matter of law.

Our conclusion in that respect requires a reversal of the judgment under review, and the entry of final judgment for both defendants.

That conclusion likewise makes unnecessary a discussion of the other errors assigned.

Judgment reversed, and final judgment for defendants.

DOYLE, PJ, HUNSICKER, J, concur.